**LYKES BROS. STEAMSHIP CO.,**
**Inc., Libelant,**

v.

**THE Tug A. W. WHITEMAN, her engines, boilers, tackle, etc., and George W. Whiteman, Respondent.**

No. 2302.

United States District Court
E. D. Louisiana, New Orleans Division.
March 5, 1956.

Terriberry, Young, Rault & Carroll, Walter Carroll, Jr., New Orleans, La., for libelant.

Wheeler, Stewart, Exnicios & Mestayer, Thomas B. Wheeler, New Orleans, La., for respondent.

J. SKELLY WRIGHT, District Judge.

In docking in a congested wharf area in the Port of New Orleans, the stern of the S.S. Velma Lykes fetched up on the bow of the S.S. Helen Lykes. At the time, the Helen Lykes was already moored and the Velma Lykes, escorted by two tugs operated by respondent, was attempting to dock in a berth immediately forward of the Helen Lykes. Libellant, owner of the two Lykes vessels, brings this libel in admiralty against respondent for damages sustained in the collision by the S.S. Helen Lykes, alleging a breach of contract through improper handling of the tugs.

Respondent was engaged by the libellant to supply tugs to furnish the motive power necessary in shifting the S.S. Velma Lykes from one berth to another in the Port of New Orleans, the Velma Lykes then being a "dead ship," without steam in her boilers or any motive power of her own. Late in the afternoon of April 3, 1952, the tugs H. C. Whiteman and A. W. Whiteman were made fast to the port bow and port quarter respectively of the Velma Lykes. Under the direction of a licensed Mississippi River pilot conducting the operation from the vessel's flying bridge, the Velma Lykes, powered by the tugs, proceeded upstream toward her intended berth just forward of the Helen Lykes, which vessel was moored starboard side to the Celeste Street Wharf in the Port of New Orleans.

A deck hand from one of the tugs was standing on the port side of the flying bridge of the Velma Lykes, relaying the signals of the river pilot to respondent, George W. Whiteman, who was at the controls of the Tug A. W. Whiteman, on the port quarter of the Velma Lykes. At the time it was still daylight with good visibility and a seven to eight mile southeast, or onshore, wind. The river was at high stage with a strong downstream current of approximately four knots.

As the Velma Lykes came abreast of her berth at the wharf, her bow was canted to starboard toward the dock and a bow line run up the wharf alongside an unidentified vessel moored just forward of the berth assigned to the Velma Lykes. At that time the pilot on the Velma Lykes signaled for the Tug A. W. Whiteman to come ahead, which signal was relayed to the respondent, at the wheel of that tug. Instead of coming ahead, the engines of the Tug A. W. Whiteman were put astern and the Velma Lykes began to slip downstream. The pilot and the master of the vessel rushed over to the port side of the flying bridge and called to respondent Whiteman for full speed ahead. Before this power could be applied by the tug, the stern of the Velma Lykes, under pressure from the slight onshore wind, drifted to starboard and fetched up on the bow of the Helen Lykes.

Respondent Whiteman, as well as his deck hand who relayed the pilot's signal from the tug, testified that the A. W. Whiteman was not going astern at the time in question. The pilot and captain of the Velma Lykes testified, however, that on their arrival at the port side of the flying bridge, they actually saw wave wash from the propeller of the A. W. Whiteman boiling forward along the sides of that vessel, indicating that the tug was going astern. In addition, the engineer on the Tug A. W. Whiteman was not produced and his absence was not explained. Since he is the one who actually manipulated the engines of the tug, he was a most important witness. The failure of the respondent to produce him gives rise to an inference that his testimony would have been unfavorable to Whiteman. Coyle Lines v. United States, 5 Cir., 195 F.2d 737, 1952 A.M.C. 715. Whiteman and his deck hand also testified that the collision was really caused by a 30-mph onshore wind acting on the freeboard of the light Velma Lykes. The records of the U. S. Weather Bureau, however, show that at the time in question, the wind was only seven to eight miles per hour. For these reasons,

the testimony of the pilot and captain of the Velma Lykes is credited and that of the respondent and his deck hand rejected. There were no other witnesses.

On the basis of the above findings, this court concludes that respondent breached his contract of towage with libellant. Implicit in that contract was the condition that respondent's tug would be operated in a seamanlike manner, without negligence and without failure or refusal to carry out, in so far as possible, all orders given by the conning pilot on the Velma Lykes in the course of the towage operation. Respondent breached this contract through his negligent failure to comply with the pilot's order to come ahead. Instead, respondent put the engines of the tug in reverse and brought the stern of the Velma Lykes in contact with the Helen Lykes, a result reasonably foreseeable in the situation at hand. See 5 Corbin, Contracts, § 1019.

Decree for libellant.