Malcolm B. TEBBS, and United States of America, Appellees,

v.

The BAKER–WHITELEY TOWING COMPANY, Appellant.

PACIFIC SHIPPING CORPORATION, a body corporate, Appellee,

v.

The BAKER–WHITELEY TOWING COMPANY, Appellant.

UNITED STATES of America, Appellee,

v.

The BAKER–WHITELEY TOWING COMPANY, Appellant.

Nos. 12838, 12839 and 12837.

United States Court of Appeals Fourth Circuit.

Argued Jan. 8, 1969.

Decided March 3, 1969.

Christopher E. Heckman, New York City (John D. Alexander, John D. Alexander, Jr., Constable, Alexander & Daneker, Baltimore, Md., and Foley & Martin, New York City, on brief) for appellant.

John H. Skeen, Jr., Baltimore, Md. (William A. Skeen, and Skeen, Wilson, Gilbert & Roach, Baltimore, Md. and Stephen H. Sachs, U. S. Atty., on brief) for appellee United States.

Solomon Kaplan, Baltimore, Md. (Sol C. Berenholtz and Murray I. Resnick, Baltimore, Md., on brief) for appellee Malcolm B. Tebbs.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

SOBELOFF, Circuit Judge:

Malcolm Tebbs, owner of the private yacht Abogado, recovered an interlocutory judgment in the District Court against the United States and The Baker-Whiteley Towing Company based on their negligence which caused a maritime collision between the tanker M/V

Sands Point and the Abogado on April 18, 1963. The accident, the court found, was caused by the concurrent fault of Baker-Whiteley and the United States, but the court awarded the United States judgment on its cross-claim against Baker-Whiteley for indemnity. Baker-Whiteley appeals from both judgments— that in favor of Tebbs and that in favor of the United States for indemnity.

At the time of the accident, the Sands Point was a "dead ship" in the custody of the U. S. Marshal because of a libel for oil pollution filed by the United States in December, 1962. The ship was moored at Broadway Pier in Baltimore in the care of John Diakakis, former chief mate of the Sands Point, whom the Marshal hired as a watchman. The ship had been moved to the pier by Baker-Whiteley tugs on April 17, but on April 18 the Marshal learned that it would have to be shifted again, to an anchorage in the river. Baker-Whiteley entered into an oral agreement with the Marshal to handle the second tow operation.

The Sands Point was moored at the pier with its bow approximately thirty feet from the Abogado and its stern extending beyond the end of the pier. Because of the ship's position, its stern lines ran forward rather than aft to the pier; therefore, only the single "forward spring line" of the ship served to prevent it from moving forward toward the Abogado. As the undocking began on April 18, the tug Holland, one of the three Baker-Whiteley tugs assigned to the operation, came alongside the Sands Point to make fast to its stern. In doing so, the tug pushed the Sands Point forward and the single forward spring line parted under the strain. The tanker consequently rammed the Abogado.

Tebbs, the Abogado's owner, filed a series of libels against the Sands Point, the United States, Baker-Whiteley, and other parties not involved in this appeal. After trial, the District Court, 271 F. Supp. 529, found that the spring line which parted was weak and that the watchman Diakakis as agent for the United States was negligent in not putting out additional lines. The court's finding of negligence as to Baker-Whiteley rested upon the failure of its undocking master, Captain Eminizer of the Holland, to check the mooring lines of the Sands Point or take other precautions against the strain that would be put on the lines as the tugs came alongside.

I

Baker-Whiteley contests the District Court's conclusion that Captain Eminizer had a duty to check the mooring lines before beginning to undock the ship. The tug owner argues that its agent was entitled to rely on the warranty of seaworthiness extended by a vessel offering herself for tow. It is true that the owner of a tow is ordinarily responsible for its seaworthiness. Curtis Bay Towing Co. v. Southern Lighterage Corp., 200 F.2d 33 (4th Cir. 1952). As the District Court pointed out, however, Baker-Whiteley knew that the Sands Point was a "dead ship" in the custody of the Marshal, and the normal assumptions concerning a competent crew and a seaworthy vessel were not justified. In a situation of this kind, the tug is responsible for both vessels. Sturgis v. Boyer, 65 U.S. (24 How.) 110, 16 L.Ed. 591 (1860); The Rebecca, 152 F.2d 607 (4th Cir. 1945). Baker-Whiteley therefore had a special duty in relation to the tow to take steps "necessary for its safety and the safety of other vessels." The Lizzie M. Walker, 3 F.2d 921 (4th Cir. 1925).

The District Court found that Captain Eminizer was "in charge of the operation" from the moment the tugs approached the Sands Point. See Midland S.S. Line, Inc. v. The Arkansas, 232 F.2d 81 (6th Cir. 1956). Therefore, it was his duty to guard against the hazards suggested by the Sands Point's situation, as described in the findings of the District Court:

As the tug Holland entered the slip, Captain Eminizer saw that the two

stern lines did not run aft from the Sands Point, and knew or should have known that they would not help prevent any forward movement of the Sands Point until she had gone forward an appreciable distance. He also knew or should have known that the Abogado was then less than 30 feet from the bow of the Sands Point. He knew or should have known that the Sands Point was in the custody of the Marshal, that there was no master or riding crew aboard except Diakakis, and that linemen were being supplied by American Ship Service and Cataneo, as they had been on April 17. Moreover, since Baker-Whiteley had directed the docking and mooring of the ship on April 17, it was at least partly responsible for the insufficient mooring lines. The circumstances of the undocking operation should have suggested that special precautions might be necessary.

■■ A tug has the duty to adapt to conditions of which it is aware, even if they are caused by the negligence or unseaworthiness of the tow. Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir. 1961); Southwestern Sugar & Molasses Co. v. River Terminals Corp., 153 F.Supp. 923 (E.D. La.1957). Here, the tug captain was aware of a situation which created a duty to inquire about the sufficiency of the Sands Point's moorings. Although he was not aware of the weak spring line, the court found that "he could have learned that it was bad by observation before the collision or by inquiry." Since he was under a duty to inquire, the measure of his knowledge is "what he is charged with finding out." Avera v. Florida Towing Corp., 322 F.2d 155, 166 (5th Cir. 1963).

Given the particular circumstances, we agree with the District Court that Captain Eminizer was negligent in failing to take adequate precautions before allowing the tug Holland to exert forward pressure on the Sands Point and that his employer, Baker-Whiteley, is therefore liable to Tebbs for the damage to the Abogado.

## II

Baker-Whiteley's appeal also attacks the District Court's holding that the United States is entitled to indemnity from Baker-Whiteley because of the latter's breach of its implied warranty of workmanlike service. The appellant claims that no such warranty is implied in a tow contract.

The doctrine of an implied warranty of workmanlike performance in maritime service contracts is most frequently applied in the context of agreements between shipowners and stevedoring companies. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The reasoning of these cases is that shipowners are entitled to the benefits of the warranty because a stevedoring company's expertise and its control and supervision of the stevedoring operations make it the party best situated to prevent accidents. See Italia Societa per Azioni de Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 323–324, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). A similar warranty has been implied in other service contracts involving comparable relationships.[1]

■■ A contract of towage, like the various agreements in the cited cases, gives rise to an implied warranty of workmanlike service. Dunbar v. Henry DuBois' Sons Co., 275 F.2d 304, 307 (2d Cir. 1960); James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 245

1. H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711 (9th Cir. 1967) (ship cleaners); Mortensen v. A/S Glittre, 348 F.2d 383 (2d Cir. 1965) (painting company); American Export Lines v. Norfolk Shipbuilding & Drydock Corp., 336 F.2d 525 (4th Cir. 1964) (shipyard); Moore-McCormack Lines, Inc. v. Boston Line and Service Co., Inc. (Launch Josephine III), 286 F.Supp. 399 (D.Mass.1968) (launch service); Giaraffa v. Moore-McCormack Lines, Inc., 270 F.Supp 342 (S.D.N.Y.1967) (ship cleaners); Barbey Packing Corp. v. The S. S. Stavros, 169 F.Supp. 897 (D.Or.1959) (pilot).

F.2d 84 (2d Cir. 1957); Singer v. Dorr Towing Co., 272 F.Supp. 931, 934 (E.D. La.1967).[2] The shipowner turns his vessel over to the control of the tug owner and relies on the latter's expertise in conducting safe towing operations. The tug does not of course become an insurer against accidents; the extent of the warranty depends on "the circumstances of [the] case relating to control, supervision, and expertise." H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711, 713 (9th Cir. 1967). In the instant case, involving a tow contract for a "dead ship," the District Court found that

> from the time the Holland and the Progress came into the slip and started to make up to the Sands Point, Captain Eminizer was in charge of the operation and owed a duty to exercise due care not to damage other vessels moored in the slip.

By its agent's failure to take precautions before undocking the ship, the tug owner breached its warranty of workmanlike performance.

■ The District Court's finding of negligence on the part of the United States—through the actions of Diakakis—does not bar the United States from enforcing its claim for breach of warranty. The rule generally applicable in stevedoring cases is properly invoked here:

> Whatever fault of a shipowner may be said to relieve the stevedore of his duty under the warranty, it seems plain that it must at the least prevent or seriously handicap the stevedore in his ability to do a workmanlike job. Merely concurrent fault is not enough. Albanese v. N. V. Nederl. Amerik Stoomv. Maats, 346 F.2d 481, 484 (2d Cir. 1965).

Diakakis' actions in failing to provide additional mooring lines in no way prevented Captain Eminizer from taking appropriate precautions before beginning the undocking operation.

The judgment of the District Court is Affirmed.

2. See also United States v. Tug Manzanillo, 310 F.2d 220 (9th Cir. 1962); Gray v. Johansson, 287 F.2d 852 (5th Cir. 1961); Farrell Lines, Inc. v. The S. S. Birkenstein, 207 F.Supp. 500, 507 (S.D.N.Y.1962).