FAIRMONT SHIPPING CORP. and Fairwinds Ocean Carrier Corp., Owners of the S.S. WESTERN EAGLE, Plaintiffs,

v.

CHEVRON INTERNATIONAL OIL COMPANY, INC., Defendant.

No. 70 Civ. 3382–LFM.

United States District Court,
S. D. New York.

March 8, 1974.

**1192**

Burlingham, Underwood & Lord, New York City, for plaintiffs; Joseph C. Smith, New York City, of counsel.

D'Amato, Costello & Shea, New York City, for defendant; Robert E. Meshel, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

In the early morning hours of December 14, 1969, the S.S. WESTERN EAGLE, a vessel of Liberian registry, stranded on a dike in Flushing Roads, a body of water leading to the port of Flushing, The Netherlands. Plaintiffs, the owners of the WESTERN EAGLE, seek to recover for the damage to the vessel, claiming that the conduct of the tugs SOPHIA and FREDERIK HENDRIK caused the grounding and that defendant is liable, in contract, for the breach by the tugs of an implied warranty of workmanlike service. The case was tried to the court, sitting without a jury, on the issue of liability only.

Plaintiffs' theory of recovery is based upon an alleged contract for bunkers [1] between plaintiffs and defendant, whereby defendant promised, among other things, to provide the WESTERN EAGLE with pilotage and tugs at Flushing. This contract, plaintiffs argue, contains an implied warranty of workmanlike service, which was breached by the tugs' conduct, and defendant is therefore liable for the foreseeable damages resulting from the breach. Defendant denies the existence of any contract between it and plaintiffs, or the existence of any clause in the contract for pilotage or towage, or of an implied warranty of workmanlike service, or any conduct by the tugs amounting to a breach of that warranty. We turn first to the question of the contract, if any, and its terms.

I. "Bunkers" are fuel oil.

The WESTERN EAGLE, a converted T–2 tanker, was bound for the United States after discharging her cargo at Boulogne and was in need of fuel. The only bunkers available in Northern France in December 1969 were being sold at excessively high prices and, therefore, Alex Pagel, an employee of Norland Shipping & Trading Co. (Norland), which was acting as agent for the vessel's owners, attempted to acquire a more economical stem[2] for the WESTERN EAGLE at other ports in Northern Europe. Pagel called C. D. Mallory & Co., Inc. (Mallory), Norland's regular bunker broker, to discuss an economical stem. Pagel spoke to Franz P. K. Werner of Mallory, who advised him that a good bunkering port might be Flushing, Holland.

Pagel examined the bunker prices at Flushing and found them to be slightly higher than at Rotterdam, where Norland had a contract with Gulf Oil Co., so he asked Werner why the WESTERN EAGLE should bunker at Flushing if it were more expensive. Werner replied: "Ah, but there is a gimmick to this one. . . . Chevron takes care of everything there. They furnish the agents and the pilots and the tugs and so forth." Werner also pointed out that Flushing, being located further south, would involve less steaming than Rotterdam.

A few days later, Mr. Joyce and Mr. Johnson, sales representatives for Chevron, met with Pagel and:

"[M]ade a small pitch for us using Flushing so that they would get the business rather than Gulf Oil and the tenor of their pitch was fairly consistent, that if we go to Flushing [they] take care of everything, they said, they take care of the pilots, they take care of the tugs, they take care of the agents and the only thing we would have to do is send an ETA for themselves there in Holland and they acted as agents for us. The suppliers

would be some company I believe called SHV or PAM Oil."

Werner testified that he made an offer to Pagel on behalf of Chevron and that, during the negotiations with Pagel, they referred to Chevron's price list for "Marine Marketing," dated October 1, 1969 (PX 2). Werner stated that this document "is sort of our booklet we go by." On page 9 of the booklet, under the column entitled "Remarks," for Flushing appears this language:

"Following included in the price: Pilotage, harbor dues, clearance, quay hire, mooring, unmooring and ordinary tug assistance if required, provided vessel enters Flushing for purpose of bunkering only and lifts min. 150 tons."

The agreement between Norland and Chevron was finalized on December 8, 1969 and is contained in plaintiffs' Exhibit 1, the "Bunker Confirmation." This document is a Mallory standard form and lists WESTERN EAGLE as the vessel involved, Norland as the buyer and Chevron as the seller of 1,000 tons of bunkers. The "Readiness Date" is listed as "December 12–16, 1969." Chevron is also listed as "Vessel's Agent."

Pagel was aware that the bunkers would be supplied at Flushing by Steenkolen Handelsvereeniging (SHV),[3] a local Dutch firm, but it was always his impression that "Chevron was the person with whom we would have the contract. . . ."

There can be no doubt from the evidence that the contract contained in Exhibit 1 was between Norland, as agent for the owners of the WESTERN EAGLE, and Chevron, as seller of the bunkers. Certainly this was the contemplation of the parties, especially Pagel and Werner, who conducted most of the negotiations. Werner made his offer to Norland on behalf of Chevron, and it was always the parties' understanding that Chevron would be the contracting party. This view is amply

---

2. A "stem" is a contract for bunkers.

3. SHV is listed on page 4 of the price list as the supplying company at Flushing.

supported by Exhibit 1, which lists Chevron as the seller, as well as by the testimony of Werner and Pagel. Chevron's claim that it acted merely as agent for SHV is not supported by the evidence. Rather, SHV acted as a subcontractor to, or supplier for, Chevron.

Moreover, the contract negotiations reveal that the parties believed the contract included a term requiring Chevron to provide tug assistance and pilotage to the WESTERN EAGLE at Flushing. Not only did Pagel and Werner rely on the Chevron price list, which spelled out the "extras" available at Flushing, but Pagel discussed the pilotage and tug provisions with Chevron's employees [4] and with Werner. In fact, these special provisions were the motivation for the vessel's bunkering at Flushing rather than Rotterdam. Thus, we find that a contract for bunkers existed between plaintiffs, the owners of the WESTERN EAGLE, and Chevron and that the contract required Chevron to provide the WESTERN EAGLE with pilotage and tug assistance at Flushing.

Plaintiffs contend that Chevron's promise to provide tugs contained an implied warranty of workmanlike service and that this warranty was breached by the SHV tugs' "negligent" conduct.

The doctrine of the implied warranty of workmanlike service in maritime contracts originated in the landmark case of Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (*Ryan*). There, the Supreme Court sustained a claim for indemnity against a stevedoring firm by a shipowner which had paid a substantial judgment to a longshoreman injured while unloading cargo improperly stowed by the stevedore. The Court reasoned that it was "of the essence of [the] stevedoring contract" that the stowage of cargo be performed competently and safely and likened the stevedore's warranty of workmanlike service "to a manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at 133–134, 76 S. Ct. at 237. The Court emphasized that the shipowner's action was in contract, not in tort.

Similar warranties have been implied in other maritime service contracts involving comparable expertise, control and supervision to that of the stevedore in *Ryan*. Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1058 n. 1 (4th Cir. 1969); Great American Ins. Co. v. Bureau Veritas, 338 F.Supp. 999, 1014 (S.D.N.Y.1972). A contract of towage also gives rise to an implied warranty of workmanlike service. Dunbar v. Henry Du Bois' Sons Co., 275 F.2d 304, 306–307 (2d Cir. 1960); James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 245 F.2d 84, 87 (2d Cir. 1957); Tebbs v. Baker-Whiteley Towing Co., *supra*, 407 F.2d at 1058–1059; A/S Atlantica v. Moran Towing & Transp. Co., 360 F.Supp. 1225, 1227 (S.D.N.Y.1973); T. J. Stevenson & Co. v. George W. Whiteman Towing, Inc., 331 F.Supp. 1038, 1043 (E.D.La.1970); Farrell Lines, Inc. v. Birkenstein, 207 F.Supp. 500, 507 (S.D.N.Y.1962).[5] The shipowner turns his vessel over to the tug's control, depending on the latter's expertise in conducting safe towing operations.

The presence and extent of the warranty and its breach, if any, depends upon the circumstances of the particular case relating to control, supervision and expertise. H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711, 713 (9th Cir. 1967); Tebbs v. Baker-Whiteley Towing Co., supra, 407 F.2d at 1059. The Supreme Court, in the stevedore cases, established the rule that "liability should fall upon the party

4. Defendant failed to produce either of these Chevron representatives at trial to dispute Pagel's testimony.

5. See also, Singer v. Dorr, 272 F.Supp. 931, 934–935 (E.D.La.1967); United States v. Tug Manzanillo, 310 F.2d 220, 222 (9th Cir. 1962). This line of cases, has been criticized in A. L. Parks, Law of Tug, Tow and Pilotage (1971), at 13, 500–01.

best situated to adopt preventive measures and thereby to reduce the likelihood of injury." Italia Societa per Azione di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964) (*Italia*). Thus, the burden should be placed, ultimately, upon the party whose default caused the injury. Reed v. The Yaka, 373 U.S. 410, 414, 83 S.Ct. 1349, 10 L. Ed.2d 448 (1963); *Italia, supra*, 376 U. S. at 324, 84 S.Ct. 748.

■ This brings us to the question of control. Chevron claims that the tugs were never in a position of control and that, therefore, no implied warranty of workmanlike service arose. This point is well taken, but this case does not turn on the narrow issue of control. Even if the tugs were not technically "in control," they may still have been the party best situated to prevent the accident, *Italia, supra*, 376 U.S. at 324, 84 S.Ct. 748, and therefore liable for breach of the warranty of workmanlike service.

We wish to emphasize that this is a case in contract, not tort, *Ryan, supra*, 350 U.S. at 134, 76 S.Ct. 232, and that non-negligent as well as negligent conduct may breach the warranty. *Italia, supra*, 376 U.S. at 315, 84 S.Ct. 748.[6] Thus, we must determine which party, if any, was in the best position to prevent the stranding of the WESTERN EAGLE and whose conduct caused the damage to the vessel. We now turn to the events of the stranding.

The WESTERN EAGLE, under the command of its master and a Belgian sea pilot, steamed into the Scheldt River, heading east for Buitenhaven, the harbor of Flushing, about 3:00 A.M. on December 14, 1969. At 3:45, L. J. Pennarts, an experienced Dutch river pilot, boarded the WESTERN EAGLE, replacing the sea pilot. At that time, the visibility was poor but sufficient to enable Pennarts to see the lights of the

pilot station, the tanker BRITISH STATESMAN, which was anchored nearby, and the fog lights of Flushing, one-half mile away. The wind was from the south at a force of 5–6 on the Beaufort scale (19–31 mph). A flood tide, or "run of the tide," was moving upriver, from west to east, at 2 to 2¼ mph.

Because the pilot boat was late leaving the pilot station, Pennarts did not board until the WESTERN EAGLE was almost abeam of Buitenhaven, nearly a mile upriver from the pilot station, where he had intended to board. Immediately after boarding, at 3:50 A.M., Pennarts called Flushing radio and announced his intention to take the ship into Buitenhaven. He then ordered the SHV tugs to come out and make fast to the WESTERN EAGLE. The tugs had, until this time, not proceeded out from Buitenhaven because the sea pilot had not ordered them to do so and because their captains thought the WESTERN EAGLE would anchor in Flushing Roads due to the unfavorable weather.

The presence of the anchored tanker, BRITISH STATESMAN, on the south side of the Scheldt, opposite Buitenhaven, prevented Pennarts from making a starboard turn there, thus maneuvering the WESTERN EAGLE'S head into the flood current. Therefore, the pilot continued upriver past the tanker, where he attempted to turn the ship to starboard by ordering the engines full speed astern. Since the WESTERN EAGLE has a right-handed screw, this maneuver would normally turn the ship to starboard, but the wind was blowing so powerfully from the south that the ship swung to port from a heading of 90° to one of 60°. Pennarts corrected the ship's course to 95° at 3:58 A.M. by ordering a hard starboard rudder and the engines slow ahead, but this brought the vessel dangerously close to running over Buoy No. 1, located on the south side of the channel. To avoid steaming

---

**6.** This disposes of Chevron's contention that misfeasance, not nonfeasance, is required to breach the warranty. *Italia* was a classic case of nonfeasance, *i. e.*, a failure to discover defective equipment. 376 U.S. at 321, 84 S.Ct. 748.

over the buoy, Pennarts, at 4:05, stopped the ship's engines and then put them full speed astern.

By this time, the SHV tugs SOPHIA and FREDERIK HENDRIK had arrived. Pennarts ordered the tugs to make fast to the WESTERN EAGLE as soon as possible. The FREDERIK HENDRIK was to make fast to the port bow, and the SOPHIA to the stern of the ship, so that the WESTERN EAGLE could be swung to starboard, with its bow facing south. The SOPHIA, however, instead of going to the vessel's stern, went amidships. The crew of the WESTERN EAGLE threw a heaving line to the FREDERIK HENDRIK, but this tug suddenly moved across the ship's bow to starboard. This sudden movement was caused by the approach of a coaster (a small river and coastal craft) moving downriver from Antwerp. The coaster sounded three short whistle blasts, and the WESTERN EAGLE responded with three short blasts and moved full speed astern. The coaster passed the ship on the port side, between the northern shore and the WESTERN EAGLE. At this point, the WESTERN EAGLE was about 3 to 3½ cables, or 1800 feet, from the northern shore.

A few minutes later, at 4:10, another downriver coaster approached, this time from the starboard side. Pennarts stopped the WESTERN EAGLE'S engines, allowing the coaster to pass on the port side. At the approach of the second coaster, both tugs moved away from the ship, apparently fearful of a collision with the coaster, The crew of the FREDERIK HENDRIK unfastened a line connecting her aft to the WESTERN EAGLE'S starboard bow, and the tug moved away.

Abandoned by the tugs, the WESTERN EAGLE was unable to combat the effect of the strong wind and the flood tide which were pushing the ship in a northeasterly direction, at a heading of 45°, towards the northern shore of the Scheldt. The SOPHIA and FRED-ERIK HENDRIK were now near the ship, but in the wrong position to make fast or otherwise render any assistance to her. Pennarts attemped to prevent the vessel from stranding, at 4:12, by ordering a hard starboard rudder with engines full ahead, but this maneuver was in vain and the vessel continued to drift towards the northern shore. At 4:13, Pennarts tried to soften the impact of the imminent grounding by putting the engines full speed astern, but the vessel was unable to make any sternway, and the ship ran aground on the dike at 4:15, about two cables to the west of Schone Waardin light, on the northern shore of the Scheldt River.

The SOPHIA and FREDERIK HENDRIK were then joined by a third SHV tug, but together they were unable to pull the WESTERN EAGLE off the shore. Later that day, at high tide, the vessel was refloated by tugs furnished by a salvor pursuant to a Lloyd's salvage agreement. The WESTERN EAGLE was then towed to drydock, where it was discovered that she had suffered extensive damage.

The evidence shows that the stranding of the WESTERN EAGLE was caused by the inadequate assistance rendered to her by the SHV tugs. The tugs not only appeared late (after the ship was well east of Buitenhaven) but, after meeting the ship, failed to make fast and provide any assistance to the WESTERN EAGLE as she drifted towards the northern shore.

Pennarts, who was in the best position to observe the danger to the ship, testified that he was depending upon the tugs to make fast and aid the ship in making a starboard turn to stem the tide. He stated that if the tugs had made fast, "I was out of the trouble." He also said that if no tugs had been available, he would have sailed up the Scheldt to No. 5 buoy and turned the ship there. In his written statement (DX A), Pennarts cited the late arrival of the tugs, along with the speed of the vessel when he boarded and his late

boarding of the WESTERN EAGLE, as one of the causes of the stranding.

Thus, Pennarts depended on the SHV tugs to help the WESTERN EAGLE combat the force of the southerly wind and the flood tide, and his decision to turn the ship just after No. 1 buoy was based on his assumption that the tugs would make fast and assist the ship. The evidence shows that the WESTERN EAGLE was unable, by the force of her own engines, to make progress against the wind and the tide. Only with the aid of the tugs could the vessel have avoided grounding.

Schuiling, the captain of the SOPHIA, testified that the tugs' normal practice was to meet ships over a mile to the west of Buitenhaven. He stated that due to the flood tide, it was especially important that the tugs meet the ship before she reached the entrance to Buitenhaven because it was easier to maneuver downriver. Although Schuiling heard the sea pilot ask by radio for a river pilot and knew that the WESTERN EAGLE was bound for Buitenhaven to bunker and that she required tug assistance, he assumed that because the weather was bad the vessel would anchor in Flushing Roads. Therefore, the SOPHIA and the FREDERIK HENDRIK did not come out into the Scheldt until ordered to do so by Pennarts. The late arrival of the tugs meant that the WESTERN EAGLE moved far upriver from the safest and easiest place for the ship to maneuver and this limited the effectiveness of the tugs' assistance to the WESTERN EAGLE.

Despite the tugs' late arrival, however, we believe the accident could have been avoided if the tugs had made fast to the WESTERN EAGLE and assisted her in turning. Unfortunately, the tugs disobeyed the orders of Pennarts to make fast to the ship and thus abandoned her to the mercy of the wind and the tide. Apparently, the tugs feared a collision with the coasters, which arrived on the scene as they were about to make fast. The testimony and written statements of Pennarts, however, who had the best

vantage point to judge the situation, fail to show that he believed there was any danger that the tugs and coasters would collide. Rather, there was ample room between the WESTERN EAGLE and the northern shore for the coasters to pass, as they did, without incident. Both Captains Schuiling and Bout (captain of the FREDERIK HENDRIK), acknowledged that they had received Pennarts' order to make fast and were in position to do so when they left the ship. In fact, the crew of the FREDERIK HENDRIK unfastened a line from the WESTERN EAGLE which had been attached to the tug.

The tugs' duty to perform under the contract included the obligation to carry out, if possible, all orders given them by the pilot during the performance of their duties. Lykes Bros. S. S. Co. v. The A. W. Whiteman, 138 F.Supp. 725, 727 (E.D.La.1956); Rawls Bros. Contractors, Inc. v. United States, 251 F. Supp. 47, 52 (M.D.Fla.1966). This the tugs failed to do.

Moreover, the evidence shows that the tugs, and only the tugs, could have prevented the stranding. The WESTERN EAGLE was dependent on the tugs' expertise to prevent her from drifting towards the northern shore, since her engines were unable to move the ship against the force of the wind and tide. Applying the standard laid down by the Supreme Court in *Italia* and *Reed*, (1) the tugs were in the best position to adopt measures to prevent the accident, but did not, 376 U.S. at 324, 84 S.Ct. 748, and (2) the tugs caused the accident, 373 U.S. at 414, 83 S.Ct. 1349, and thus failed to fulfill their warranty of workmanlike service.

Since Chevron is responsible under its contract with plaintiffs for the performance rendered by its subcontractor or agent, SHV, Todd Shipyards Corp. v. Moran Towing & Transp. Co., 140 F. Supp. 107, 110 (E.D.N.Y.1956), aff'd, 247 F.2d 626 (2d Cir. 1957), the conduct of the SHV tugs constituted a breach of Chevron's implied warranty of workmanlike service.

Chevron, however, seeks to place the blame for the accident on plaintiffs, citing as causes of the accident (1) the failure of the WESTERN EAGLE'S master to anchor his ship in Flushing Roads and (2) the unseaworthiness of the WESTERN EAGLE.

■ Before considering any alleged "fault" of the WESTERN EAGLE'S owners, we note that where a party has failed to fulfill its duty under a warranty of workmanlike service, mere concurrent fault of the shipowner will not excuse the breach of warranty. To be relieved of its breach, defendant must show that the conduct of the shipowner prevented or seriously handicapped the tugs in their attempt to perform in a workmanlike manner. Albanese v. N. V. Nederl. Amerik Stoomv. Maats., 346 F.2d 481, 484 (2d Cir. 1965); Misurella v. Isthmian Lines, Inc., 328 F.2d 40, 41 (2d Cir. 1964).

■ Defendant's expert testified that because of the dense fog conditions, the WESTERN EAGLE should have anchored in Flushing Roads. He explained that there was no traffic control at Flushing and that it was very easy for a ship to collide with the port facilities and jetties. Therefore, he said, "any ship of a size over 1000 tons will definitely come at anchor in dense fog and will not try to enter Flushing Harbor."

The problem with this theory is that the evidence does not show that dense fog conditions prevailed. Pennarts' testimony was that when he boarded he could see lights on shore, over half a mile away. Visibility on land was poor and visibility on the Scheldt deteriorated as the WESTERN EAGLE moved upriver, but it appears that the fog was scattered, heavy in some places but very light in others. Defendant failed to produce any evidence showing that Pennarts' estimate of the visibility on the Scheldt at the time he boarded the WESTERN EAGLE was inaccurate. Tjeed, defendant's expert, testified that

if the pilot could see shore lights, "so we have a visibility of half a mile, I think he is entitled to proceed." We find that dense fog conditions were not present, and, therefore, the WESTERN EAGLE need not have anchored in Flushing Roads.[7]

Defendant also claims that the WESTERN EAGLE was unseaworthy and that, therefore, plaintiffs' recovery is barred. Specifically, Chevron claims that the WESTERN EAGLE was unseaworthy because (1) her radar was not working properly and (2) the ship was improperly trimmed, being 8 feet light at the bow. We reject both allegations of unseaworthiness.

Defendant contends that the radar of the WESTERN EAGLE was cluttered and that the faulty radar, combined with the inattentiveness of the master and crew, led to the near collision of the SHV tugs with the downriver coasters and the subsequent stranding of the vessel. This theory is not supported by the evidence. Pennarts testified that he was able to read the radar and that the clutter presented no problems in maneuvering the vessel. And both the pilot and Captain Schuiling observed the coasters on their radar minutes before they arrived. Thus, the appoach of the coasters came as no surprise to either the tugs or the WESTERN EAGLE, and the radar clutter played no part in the stranding.

Chevron also contends that the WESTERN EAGLE was improperly trimmed and that this caused her to follow the wind, swinging her bow to port when her engines were full astern. Pennarts found nothing unusual about the vessel's trim, however, and defendant's expert stated that a ship might well act unpredictably, as the WESTERN EAGLE did, in a strong wind. We think it obvious that a wind of force 5–6 on the Beaufort scale would have interfered with the navigation of any vessel, whether trimmed properly or improperly. In addition, de-

7. Our finding that dense fog conditions were not present similarly disposes of Chevron's contention that the WESTERN EAGLE was derelict in not sounding proper fog signals.

fendant has failed to show by any convincing evidence that the trim of the WESTERN EAGLE, rather than the failure of the SHV tugs to assist her, led to the stranding.

In short, defendant has utterly failed to demonstrate that the condition of the WESTERN EAGLE, or any conduct by her master or crew, hindered or prevented the tugs from performing in a workmanlike manner.

Accordingly, we find defendant is liable to plaintiffs for breach of its warranty of workmanlike service and for any foreseeable damages suffered by the WESTERN EAGLE caused by that breach. A Special Master will be appointed, pursuant to Rule 53(a), Fed. R.Civ.P., to determine damages. The parties are directed to submit an order, not inconsistent with this opinion, within ten (10) days. The foregoing constitutes this court's findings of fact and conclusions of law, as required by Rule 52(a), Fed.R.Civ.P.

So ordered.