Robert STEVENS, Plaintiff,

v.

EAST–WEST TOWING COMPANY,
INC., et al., Defendants.

AVONDALE SHIPYARDS, INC., Defend-
ant-Appellant, Cross-Appellee,

v.

EAST–WEST TOWING COMPANY, INC.
and Vanguard Insurance, Defendants-
Appellees, Cross-Appellants.

No. 79–2875.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 6, 1981.

John O. Charrier, Jr., New Orleans, La., for defendant-appellant, cross-appellee.

Phelps, Dunbar, Marks, Claverie & Sims, Winston Edward Rice, New Orleans, La., for defendants-appellees, cross-appellants.

Before GOLDBERG, AINSWORTH and RUBIN, Circuit Judges.

AINSWORTH, Circuit Judge:

In this admiralty case, plaintiff Robert Stevens brought suit for personal injuries sustained February 4, 1974, while he was working as a deckhand on the tugboat DELTA DAWN at the Westwego facility of Avondale Shipyards, Inc. (Avondale) on the Mississippi River. Stevens sued his employer, East-West Towing Company, Inc. (East-West), under the Jones Act, 46 U.S.C. § 688. He also sued Central Marine Services, Inc. (Central Marine), the owner of Barge W–102 (an appurtenance of which injured Stevens), and Avondale, the bareboat charterer of the barge, under general admiralty prin-

ciples. East-West settled Stevens' suit for $200,000 and an assignment of his claim against the other defendants. The district judge tried the third party actions for contribution and indemnity among the defendants by the use of depositions and documents only, without oral argument or live testimony.

The district judge held that Central Marine was not liable to East-West, since Central Marine's bareboat charter made Avondale the owner *pro hac vice* of Barge W–102 for the term of the charter. No party appeals the district court's disposition of this issue. However, Avondale appeals from the trial court's decision that Barge W–102 was unseaworthy, that Avondale was negligent, and that it should contribute fifty percent, or $100,000 to East-West as its share of Stevens' damages. Likewise, East-West appeals from the district court judgment refusing East-West's request for contribution from Avondale for Stevens' maintenance and cure and for prejudgment interest. We hold that Barge W–102 was not unseaworthy, nor was Avondale negligent. Alternatively, even if Avondale was negligent or its barge unseaworthy, we hold that Avondale has asserted a complete defense against East-West: namely, that East-West breached its warranty of workmanlike performance that it owed Avondale. Accordingly, we reverse the district court's judgment holding Avondale liable for any contribution.

I. Facts

For several weeks before the accident, Barge W–102 had been used to assist in constructing the drilling rig ST. LOUIS in the Avondale shipyards. The barge had a cherry picker crane approximately amidships which was held in place by metal "saddles" resembling upside down U's welded to the deck over each of the crane's four legs. The barge worked around the three accessible sides of the ST. LOUIS, using the crane to remove material from the rig.

On February 4, 1974, the tugboat DELTA DAWN received a radio call to move Barge W–102 from the downstream side of the ST. LOUIS to the river side for the day's

operations. The DELTA DAWN and her crew had moved the barge several times before February 4[1] and continued to shift it on several occasions after that date without mishap. However, on the 4th, when the tug tied onto the barge to await towing orders,[2] Stevens tied the bowline to a "stop plate" on the starboard stern or river downstream leg of the crane.[3] The stop plate was manifestly not a proper place to tie up the tug. The crane operator had warned the DELTA DAWN's captain and crew on separate occasions that the stop plate could not withstand any strain. Avondale's shipfitter foreman had "chewed out" the tugboat captain and Stevens for tying up to one of the crane's saddles explaining that "hanging onto" small metal pieces was too dangerous. And the tug captain specifically ordered Stevens to untie the line from the stop plate on the day of the accident. Stevens came back aboard the tug and was standing in the bow when the current of the river moved the tug away from the barge, drew the bowline taut, and caused the stop plate to snap. The bowline whipped back with the stop plate and struck Stevens in the head causing him severe injuries.

## II. Standard of Review

■ The district judge's findings concerning seaworthiness and negligence are normally considered findings of fact. *Webb v. Dresser Industries, Inc.*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157–58, 51 L.Ed.2d 572 (1977). Both parties agree that such findings of fact may not be set aside unless clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); *Webb v. Dresser Industries, Inc., supra* at

606. Likewise, both parties agree with the Supreme Court's definition in *McAllister* of the clearly erroneous standard:

> A finding is clearly erroneous when " 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' " *United States v. Oregon State Medical Society*, 343 U.S. 326, 329, 72 S.Ct. 690, 698, 96 L.Ed. 978; *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746.

348 U.S. at 20, 75 S.Ct. at 8. Finally, we note that under this circuit's jurisprudence, when a case is tried on a "cold" record consisting entirely of depositions and documents, the burden of proving the district court's findings clearly erroneous is "to some extent ameliorated." *McKensie v. Sea Land Service, Inc.*, 551 F.2d 91, 92 (5th Cir. 1977); *Sicula Oceanica, S.A. v. Wilmar Marine Engineering & Sales Corp.*, 413 F.2d 1332, 1333 (5th Cir. 1969). With or without this reduced burden of proof, the evidence leaves us with a definite and firm conviction that a mistake has been committed and that the district court's findings were clearly erroneous.

## III. The Unseaworthiness of Barge W–102

### A. Missing Bitts and Cleats

The district court found that Barge W–102 was unseaworthy because it was missing bitts and cleats necessary to tie up and to tow the barge.[4] The existence, number, and condition of the bitts and cleats on the river side of the barge were important issues in the case. At least ten people were

---

1. The captain of the DELTA DAWN, Paul Verdin, stated that he moved Barge W–102 approximately one to four times a day for a week prior to the accident. Verdin Dep. at 52, 83–84.

2. Douglas Adams, an Avondale general foreman, gave Captain Verdin instructions concerning where to move the barge. However, Adams left the actual moving to the tug and its crew. Adams Dep. at 14–15.

3. The stop plate was a piece of metal approximately two inches wide, ten inches long and one-half inch thick "tack-welded" to the crane leg to prevent part of the hydraulic machinery from hyperextending.

4. A bitt is a piece of metal affixed to the deck and resembles a large upright spool. Lines are wrapped around the narrower body of the bitt and are held in place by the wider head. Two bitts attached to the same metal plate on the deck are called a double bitt. A cleat resembles a large anvil.

asked in their depositions about the bitts and cleats on Barge W–102. A review of these depositions shows at least two things: no one could remember how many bitts and cleats were on the barge on the date of the accident, and only Killian Huger, the president of Central Marine, knew how many bitts and cleats were supposed to be on the barge. The district judge cut the Gordian knot by giving credence to the deposition testimony of the crane operator, who stated that he could remember only one bitt standing on February 4, 1974.

However, among the hundreds of pages of depositions and documents in the record, there are four exhibits which convince us that the crane operator's memory was incorrect and that the district court's finding was erroneous. Exhibit Eustis 8 is a copy of the blueprints for a barge similar to Barge W–102. They show that the barge is designed to have a double bitt at each corner and two cleats on each side, or a total of twelve cleats and bitts. On the blueprints are these words: BUILT IN ACCORD-ANCE WITH AMERICAN–BUREAU-OF–SHIPPING SPECIFICATIONS FOR CLASSIFICATION + A1 BARGE RIV-ERS, BAYS & SOUNDS. In addition, three different photographers took pictures of the scene within twenty-four hours of the accident. Lawrence Stepteaux, employed by Avondale, arrived very soon after the accident.[5] His seven photographs, marked *in globo* Exhibit 5, clearly show the double bitt and the cleat at the downstream end on the river side of the barge. Indeed, the DELTA DAWN is shown to be tied up at the downstream cleat in Stepteaux's photograph. Another of Stepteaux's photographs shows somewhat less clearly the upstream cleat and bitt. Richmond Eustis, the original attorney for East-West, visited Barge W–102 the night of February 4 and took seven photographs. Eustis 7 shows a double bitt, one side of which has a mooring line wrapped around it extending to a vessel. Eustis 2 shows another mooring line running from a vessel to a cleat on the barge. Eustis testified that # 7 was the downstream double bitt and # 2 was the upstream cleat. Finally, Francis Richard, employed by Central Marine, took nineteen pictures of the area on February 5, marked in the record as *in globo* Exhibit 6. These photographs clearly show both double bitts and both cleats on the river side of Barge W–102. Another barge is tied up to the downstream double bitt, and a man appears to be preparing to tie the DELTA DAWN to the upstream cleat.

Thus, although the deposition testimony must be considered, what is so clearly shown by the three sets of photographs taken within twenty-four hours of the accident must prevail over the witnesses' admittedly unclear memory. The photographs prove that Barge W–102 had its full complement of bitts and cleats on the river side, and thus the premise upon which the district court based its finding of unseaworthiness was clearly erroneous.

### B. Failure to Provide an Additional Bitt or Cleat

In its brief, East-West acknowledges the frailty of the unseaworthiness argument based on Barge W–102's missing bitts or cleats and instead suggests that the barge was unseaworthy because Avondale had failed to provide an additional bitt or cleat amidships. The captain of the DELTA DAWN had a preference for "hip-towing" the barge, or towing it sideways, and to do so he needed to tie up in the middle of the barge. East-West argues that failure to add a cleat or bitt to accommodate the captain made the barge unseaworthy.

A vessel is unseaworthy if it and its appurtenances are not "reasonably fit for their intended use. The standard is not perfection but reasonable fitness; not a ship that will weather every conceivable storm ... but a vessel reasonably suited for her intended service. *Boudoin v. Lykes Bros. S. S. Co.*, 348 U.S. 336, [339], 75 S.Ct.

---

**5.** One of Stepteaux's photographs shows the still wet blood from the accident on the tug's deck.

382, [385], 99 L.Ed. 354 [(1955)]." *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). At the time of the accident, the DELTA DAWN was merely standing by, awaiting instructions to tow the barge. As the photographs put into evidence demonstrate, the bitts and cleats on the barge were eminently fit as places to tie up. As for providing a reasonably fit place for a tug to attach a line for a "hip-tow," we emphasize that a vessel does not have to have bitts and cleats to accommodate every conceivable towing method in order to be seaworthy. The DELTA DAWN had successfully moved Barge W–102 using other towing methods and had perfected hip tows by attaching the line to the obviously more substantial crane leg. The barge's bitt and cleat placement conformed to its blueprints. Under these circumstances, it was error to hold that the barge was unseaworthy.

## IV.  Negligence of Avondale

The district court found "Avondale's failure to remedy the situation [missing bitts and cleats] resulted in a continuing negligent act. . . . [T]he owner is also liable for continuing negligence when, once notified, he fails to remedy the condition which renders the vessel unseaworthy."

Since the photographic exhibits show that the bitts or cleats were in fact not missing, Avondale cannot be held to be negligent on the grounds that they were. The district court found that Stevens, the injured DELTA DAWN deckhand, told an Avondale employee, Douglas Adams, that "there were no other places on the barge to which he could secure the lines," and held that Avondale was thus on notice that the ship was unseaworthy and was negligent for failing to correct the situation. If Stevens made such a statement, he misstated the facts.[6] Avondale cannot be found negligent for failing to correct Stevens' misconception.

Again recognizing the tenuousness of its negligence argument based on missing cleats and bitts, East-West suggests in its brief that Barge W–102 was in a generally dilapidated condition—it had holes in its deck—and that Avondale was negligent in failing to repair the barge. This argument is meritless. No suggestion was made that the holes in the barge's deck were a proximate cause of Stevens' injuries, nor could any such suggestion be seriously advanced. Likewise, East-West's argument that the bitts and cleats on the barge were in unsound condition is conclusively refuted by the photographs in evidence showing the bitts and cleats in actual use.

## V.  East-West's Warranty of Workmanlike Performance

We find persuasive Avondale's alternative argument that even if the lack of a cleat or bitt directly amidships made Barge W–102 unseaworthy, or if Avondale's failure to add a cleat or bitt amidships was a negligent omission, Avondale may still successfully defend against any liability because East-West breached its warranty of workmanlike performance. In the usual case, the injured plaintiff (Stevens) would have recovered against the barge owner (Avondale) and the barge owner would be seeking indemnity from plaintiff's employer (East-West). In this case, since East-West is standing in Stevens' stead, Avondale is using its indemnity rights as a defense.

In summarizing development of the warranty of workmanlike performance, the Second Circuit stated:

> The shipowner, relying on the stevedore's expertise, entrusts loading operations to its supervision and control, thereby putting the stevedore in the best position to prevent accidents. The same reasoning has been applied to "dead" tows, *Tebbs v. Baker-Whiteley Towing Co.,* 407 F.2d 1055, 1058 (4th Cir. 1969) . . . . Therefore, we find the crucial elements of

---

**6.** We are unable to find in Adams' deposition any reference to such a statement by Stevens. In any event, Adams' memory of his conversation with Stevens is understandably hazy a year and a half after the event. Adams expressed reservations about the exact conversation seven times in the space of two pages of depositions. *See* Adams Dep. at 16–17.

*Ryan [Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232 [100 L.Ed. 133] (1956)] to be as follows: a shipowner, relying on the expertise of another party (the contractor), enters into a contract whereby the contractor agrees to perform services without supervision or control by the shipowner, the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault. *Fairmont Shipping Corp. v. Chevron International Oil Co.,* 511 F.2d 1252, 1257–58 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975) (footnotes omitted).[7] In the instant case, Avondale, relying on the DELTA DAWN crew's expertise, entrusted towing operations to its supervision and control, thereby putting the crew in the best position to prevent the accident. However, the district court held that Avondale was not entitled to indemnification or contribution on two grounds. First, the court

held that the DELTA DAWN had contracted to provide towing services, and at the time of the accident, the tug did not yet have Barge W–102 in tow. Second, the court found that Stevens' actions did not render the barge unseaworthy nor did his actions bring a preexisting unseaworthy condition into play.

The district court drew an erroneous conclusion from the fact that the DELTA DAWN did not yet have the barge in tow. The court failed to give proper consideration to the fact that at the time of the accident the tug was making fast to the barge. The DELTA DAWN's warranty of workmanlike performance extended to all towing operations including preparations necessary and incident to the actual moving of the barge. In *Tebbs v. Baker-Whiteley Towing Co.,* 407 F.2d 1055 (4th Cir. 1969), a case with somewhat analogous facts, a tug contracted to provide towing services to a barge. As the tug was attempting to make fast to the barge, it bumped the vessel. The bump caused the barge's defective

---

**7.** The 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 (LHWCA), have abrogated the *Ryan* doctrine as it applies to stevedores and other employers whose workers are covered by the Act. 33 U.S.C. § 905(b). The pertinent legislative history on this point provides as follows:

The Committee also believes that the doctrine of the *Ryan* case, which permits the vessel to recover the damages for which it is liable to an injured worker where it can show that the stevedore breaches an express or implied warranty of workmanlike performance is no longer appropriate if the vessel's liability is no longer to be absolute, as it essentially is under the seaworthiness doctrine.

H.R.Rep.No.1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S. Code Cong. & Ad. News 4698, 4704. However, the courts have extended the *Ryan* doctrine to marine contracts not covered by the LHWCA where the seaworthiness doctrine may still apply, as it would in the instant case. *See* Section III, *supra.* For cases extending the *Ryan* doctrine to other marine contracts, see *Fairmont Shipping Corp. v. Chevron International Oil Co.,* 511 F.2d 1252 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975) (towage contract); *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296 (5th Cir. 1973), *cert. denied,* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d

572 (1974) (diesel dredge repair contract); *Whisenant v. Brewster-Battle Offshore Co.,* 446 F.2d 394 (5th Cir. 1971) (drill pipe testing contract); *Tebbs v. Baker-Whiteley,* 407 F.2d 1055 (4th Cir. 1969) (towage contract); *Lusich v. Bloomfield Steamship Co.,* 355 F.2d 770 (5th Cir. 1966) (ship repair contract); *James McWilliams Blue Line, Inc. v. Esso Standard Oil Co.,* 245 F.2d 84 (2d Cir. 1957) (towage contract). Thus, the 1972 amendments do not affect the applicability of the warranty of workmanlike performance to contractors not covered by the LHWCA. *See Aparicio v. Swan Lake,* 643 F.2d 1109, 1118 (5th Cir. 1981); *Fairmont Shipping Corp. v. Chevron International Oil Co., supra,* at 1258 n.10; *Leckelt v. Superior Oil Co.,* 608 F.2d 592, 593 n.1 (5th Cir. 1979). In addition, although the towage cases cited above involved property damage, the cases in general make no distinction between actions for indemnity against liability for personal injuries or for property damage. Actions for indemnity may be maintained when a towage contractor breaches its warranty of workmanlike performance resulting in personal injury. *See Dunbar v. Henry DuBois' Sons Co.,* 275 F.2d 304 (2d Cir.), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960) (shipowner may sue towage contractor under breach of warranty theory for indemnity in wrongful death action).

mooring line to sever and drove the barge into a nearby yacht. The Fourth Circuit held that the tug breached its warranty of workmanlike performance and the barge owner was entitled to indemnity. *See also Fairmont Shipping Corp. v. Chevron International Oil Co., supra* at 1260–61 (in contract to provide towing services, failure to reach vessel in time to tow was breach of warranty). Stevens' failure to tie up to the available bitts and cleats, or the crane leg, while waiting to tow the barge, were all part of the towing operation.

Second, Stevens had been warned by an Avondale employee, his own boss, and the crane operator not to tie up to this obviously inadequate stop plate. The crane operator even explained why the stop plate was not adequate. Staunch bitts were available on the barge, as the photographs in evidence demonstrate. The barge had been successfully hip-towed by tying onto the crane leg and had been towed in other fashions. The accident occurred only by Stevens' insistence on using the inadequate stop plate.

East-West makes a final argument that breach of the warranty of workmanlike performance entitles shipowners to indemnity only if they are not themselves guilty of negligence. However, the Supreme Court and the circuit courts have recognized that a negligent shipowner may still be entitled to indemnity. *Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567–68, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958); *Commercial Union Insurance Co. v. M/V BILL ANDREWS*, 624 F.2d 643, 647 (5th Cir. 1980); *Fairmont Shipping Corp. v. Chevron International Oil Co., supra* at 1260; *Tebbs v. Baker-Whiteley Towing Co., supra* at 1059. Avondale's failure to add a cleat or bitt not called for in the barge's blueprints did not prevent the contractor from doing a workmanlike job and thus does not bar indemnity.

### VI.   Conclusion

The district court's finding that bitts and cleats on the river side of Barge W–102 were missing is clearly erroneous. A finding of unseaworthiness or negligence based on this finding must therefore be reversed.

In addition, if the absence of an additional bitt or cleat directly amidships rendered Barge W–102 unseaworthy and Avondale negligent, the East-West tug crew's breach of their warranty of workmanlike performance nevertheless entitled Avondale to prevail in this case.

REVERSED.