# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 24, 2024

Lyle W. Cayce
Clerk

_____

No. 23-40209

_____

PARAGON ASSET COMPANY, LIMITED, *as Owner of the Drillship DPDS1*,

*Plaintiff—Appellant*,

*versus*

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INCORPORATED,

*Defendant—Appellee*,

*versus*

PARAGON OFFSHORE LIMITED,

*Defendant—Appellant*,

PARAGON INTERNATIONAL FINANCE COMPANY,

*Third Party Defendant—Appellant*,

PARAGON OFFSHORE DRILLING, L.L.C.,

*Counter-Claimant—Appellant*,

*versus*

SIGNET MARITIME CORPORATION,

*Claimant—Appellee,*

_____

IN THE MATTER OF THE COMPLAINT OF SIGNET MARITIME CORPORATION, *as Owner of the Tug Signet Enterprise, its engines, tackle, etc., in a Cause of Exoneration from or Limitation of Liability*

SIGNET MARITIME CORPORATION, *as Owner of the Tug Signet Enterprise, its engines, tackle, etc., in a Cause of Exoneration from or Limitation of Liability,*

*Plaintiff—Appellee,*

*versus*

PARAGON ASSET COMPANY, LIMITED,

*Counter-Claimant—Appellant,*

_____

IN THE MATTER OF THE COMPLAINT OF SIGNET MARITIME CORPORATION, *as Owner of the Tug Signet Arcturus, its engines, tackle, etc., in a Cause of Exoneration from or Limitation of Liability*

SIGNET MARITIME CORPORATION, *as Owner of the Tug Signet Arcturus, its engines, tackle, etc., in a Cause of Exoneration from or Limitation of Liability,*

*Plaintiff—Appellee,*

*versus*

PARAGON ASSET COMPANY, LIMITED,

*Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 1:17-CV-203, 1:17-CV-247,
1:18-CV-35

_____

Before HIGGINBOTHAM, SMITH, and HIGGINSON, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

This is an appeal of an Opinion and Order issued by the district court concerning liability in a series of maritime casualties caused by the breakaway of a drillship in Port Aransas, Texas during and after Hurricane Harvey. Appellant Paragon Asset Company ("Paragon") owned the vessel, the DPDS1—an unmanned and unpowered drillship—which was docked at Port Aransas prior to Hurricane Harvey's arrival to the area on August 25, 2017. After its evacuation effort failed, Paragon hired two tugs owned by Signet Maritime Corporation ("Signet") to apply power throughout the storm in an attempt to help keep the vessel moored to the dock.

On August 25, 2017, at the height of the storm, the DPDS1 broke from its moorings, alliding with both Signet tugs and sinking one. The DPDS1 then ran aground in the Corpus Christi ship channel, but on August 28, 2017 it refloated and allided with a nearby research pier owned by the University of Texas ("UT"). Applying maritime negligence law, the district court found Paragon alone to be liable for the August 25 breakaway. Because Signet had supplied a third tug to monitor the DPDS1's movement after the storm, and that tug failed to stop the vessel's allision with the UT pier, the district court concluded that Signet and Paragon were equally liable for the damages suffered by UT.

Paragon appeals, asking that we apply a "towage law" standard of duty to Signet's provision of its services to Paragon. Paragon further contests the district court's determination that a force majeure defense was not

3

available to Paragon, and asks us to reverse the district court's determination regarding which contract between the parties governed Signet's services. Having reviewed the record and relevant law, we find that the district court did not err in its finding of facts or conclusions of law. Accordingly, we AF-FIRM.

I.

On Wednesday, August 23, 2017, Paragon and Signet began discussions regarding the hiring of Signet tugs to tow the DPDS1 out to open sea before Hurricane Harvey made landfall. On Thursday, August 24, 2017, after delays and the closure of the port foiled the DPDS1's evacuation effort, Signet agreed to provide Paragon with two tugs, the ARCTURUS and the EN-TERPRISE, to aid in keeping the DPDS1 moored to the Port Aransas dock during the storm. At around 11:00 P.M. on August 25, 2017, the DPDS1 broke free of its moorings and propelled the ARCTURUS and the ENTER-PRISE into nearby oil rigs. The ENTERPRISE sank, and the ARCTURUS and the oil rigs sustained damage. The ENTERPRISE crew was rescued the next morning.

The DPDS1 continued into the Corpus Christi ship channel, where it remained grounded for three days. During this time, Paragon retained Signet to provide a tug to monitor the grounded vessel. On August 27, 2017, the tug CONSTELLATION began monitoring the DPDS1, but because the DPDS1 had loose lines hanging from it, and because Hurricane Harvey was projected to return to Corpus Christi, the crew of the CONSTELLATION did so from a nearby dock rather than next to the vessel itself. On August 28, 2017, the DPDS1 refloated and allided into the UT research pier. The CONSTELLA-TION was unable to stop the allision with the UT pier, but afterwards it pinned the DPDS1 to the shore. Signet subsequently provided three more

tugs to hold the DPDS1 to the shore until the drillship could be towed to another dock.

After a five-day bench trial, the district court found that Paragon alone was liable for the August 25, 2017 breakaway of the drillship, and rejected its force majeure defense as well as its argument that Signet assumed the risk by agreeing to help keep the vessel moored. In doing so, the trial court rejected Paragon's argument that it had no duty to Signet under maritime law of towage, holding that Signet did not undertake the tow of the DPDS1 or take control of it, so towage law was inapplicable. The district court held that, under maritime law of negligence, Paragon was liable for the breakaway incident because it unreasonably relied on reports about the strength of its mooring system, which it knew were not based in fact, and because Paragon's leadership failed to call for an evacuation when it became clear that was the prudent course of action. The district court found the parties—Paragon and Signet— each to be 50% liable for the damage to the UT research pier.

Finally, the parties debated whether a Master Charter Agreement ("MCA") or Signet's Tariff ("the Tariff") governed Signet's provision of tugboats to Paragon. The district court ruled in favor of the Tariff, finding that Signet had expressly refused to agree to the terms of the MCA for the provision of services, pointing to the course of dealing in the summer of 2017, when Paragon had engaged Signet tows to hold the drillship multiple times and had paid the Tariff rate. The district court rejected Paragon's arguments that the MCA governed, including its contention that the Tariff could not govern because it contained explicit language that it did not cover Signet's services to vessels "aground or in distress, including assistance to a dead-ship . . . , or when Services are performed during heightened Coast Guard port conditions."

Paragon appeals on three issues: first, it argues that the trial court should have applied towage law, thus shifting to Signet some duty owed to keep the drillship from harming others' property. Second, it argues that the trial court erred in rejecting its force majeure defense, "impermissibly" holding Paragon "to a standard of perfection and infallible judgment by viewing its actions through the lens of *post hoc* knowledge." Third, it argues that the trial court erred in finding that Signet's Tariff governed the interactions between the two parties, because Signet unilaterally and orally amended the Tariff. Rather, under general maritime and Texas law, the district court should have held the relationship to be "at law" or governed by the MCA, and Signet should not have been allowed to seek indemnity or attorney's fees from Paragon.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011) (italics omitted) (quoting *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006)). We will first consider whether the district court incorrectly applied maritime negligence law, before turning to Paragon's arguments regarding the force majeure defense and the governing contract.

Paragon contends that the district court erred when it applied general maritime negligence law rather than towage law. Paragon argues not that it would be released from liability if the district court recognized Signet's activities on August 25, 2017 as a tow; rather, it asserts that the application of towage law would re-orient the inquiry about Paragon's duty to Signet and Signet's duty to Paragon so as to reduce Paragon's fault. At trial, Paragon situated its law of towage argument within a larger contention that Signet

assumed the risk that the DPDS1 might break free when Signet agreed to the task of helping keep the DPDS1 at the dock—and, therefore, that Signet forfeited any right to recover from Paragon when it failed to mitigate the risk it was hired to guard against. The district court rejected this argument, and Paragon does not pursue its general assumption of risk argument on appeal.

Here, Paragon has retained its claim that the law of maritime towage should apply. The district court rejected the towage law standard that Paragon proposed because "Signet never undertook the tow of the DPDS1, and at no point did Paragon relinquish custody of the DPDS1 to the Signet tugs." Helping keep the DPDS1 moored to the dock did not constitute a tow, the district court held, and "Paragon did not shift to Signet the duties that Paragon owed to ensure that the drillship was properly moored to prevent allision with objects within the scope of danger should the mooring system fail."

Instead, the district court found that the incidents during Hurricane Harvey should be governed by the standard for negligence articulated within general maritime law. "To establish maritime negligence, 'a plaintiff must demonstrate that there was [1] a duty owed by the defendant to the plaintiff, [2] breach of that duty, [3] injury sustained by the plaintiff, and [4] a causal connection between the defendant's conduct and the plaintiff's injury.'" *GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 659 (5th Cir. 2017) (alteration in original) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)). A shipmaster has a "a special duty to take all reasonable steps consistent with safety to [a] ship and her crew, to avoid or minimize the chance of harm to others." *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 85 (5th Cir. 1960). The Supreme Court has stated that, if a ship drifts from her moorings and causes a collision, "she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and

precaution, and a proper display of nautical skill could not have prevented." *The Louisiana*, 70 U.S. (3. Wall.) 164, 169 (1865) (internal italics omitted).

The district court also cited our court's decision in *In re United States*, 425 F.2d 991, 995 (5th Cir. 1970) to articulate the responsibility of a shipowner during a storm: "If those responsible for the [barges that broke free and caused allisions] were reasonable in their anticipation of the severity of the impending storm and undertook reasonable preparations in light of such anticipation, then they are relieved of liability." *Id.* And, specifically with regard to docked vessels, the trial court relied on the rule expressed in the *Carroll Towing* case:

> Since there are occasions when every vessel will break from her moorings, and since, if she does, she becomes a menace to those about her; the owner's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions.

*United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). Under the caselaw regarding maritime negligence, the district court concluded that Paragon was negligent: first, "company decision makers knew or should have known that they possessed inaccurate information about the mooring system installed to keep the DPDS1 docked," because the reports on the strength of the mooring system commissioned by Paragon reflected *projected* combinations of mooring lines and ropes—not any real mooring system that had actually been put in place. Second, the district court found that Paragon company officials were unreasonable in their assessment of the strength and potential danger of Hurricane Harvey, and in their choice to wait until Wednesday, August 23, to choose to evacuate the drillship even though they received weather reports at 9:00 A.M. the morning of Monday, August 21 that showed Corpus Christi in the storm's cone of uncertainty. Testimony supported the

trial court's factual finding that the DPDS1's evacuation would more likely have been successful if Charles Yester, Paragon's Senior Vice President of Operations, had called in the evacuation order earlier, and the trial court found that a reasonable captain would have planned for potential exigencies, including the sources of delay that accrued on Thursday before the port closed.

Paragon argues that the district court was mistaken in its reliance on the normal negligence standard for maritime torts. Rather, it argues that Paragon "owed Signet no duty to provide a vessel which would not break away during Hurricane Harvey, as this was the precise reason Signet undertook the job of holding it." Reasoning that the DPDS1 was a "dead" vessel, Paragon relies on caselaw that emphasizes the duty of a tug owner to guard against hazards, even those caused by the unseaworthiness of the vessel being towed. *See Bisso v. Waterways Transp. Co.*, 235 F.2d 741, 743 (5th Cir. 1956) ("To be sure, there was a strong current . . . but this was well known and its imminence was the reason the owners of [the vessel] agreed expressly with [the tug] to provide a local assisting tug of adequate power.").

The threshold question, therefore, is whether the relationship between Signet and Paragon involved a tow at all. As an initial matter, treatises and caselaw state generally that towage law is applicable when one vessel acts to "aid the propulsion or to expedite the movement of another vessel." 2 T. Schoenbaum, Admiralty and Maritime Law § 12:1 (West 6th ed. 2023); *see also Stevens v. The White City*, 285 U.S. 195, 200 (1932) ("The supplying of power by a vessel, usually one propelled by steam, to tow or draw another is towage. Many vessels, such as barges and canal boats, have no power of their own and are built with a view to receiving their propelling force from other sources. And vessels having motive power often employ auxiliary power to assist them in moving about harbors and docks.").

By contrast, Paragon cites four cases that it says stand for the proposition that "[t]owage law's application does not require a tug's provision of motive power to a vessel in transit" *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215 (1945); *Stevens v. E.-W. Towing Co.*, 649 F.2d 1104 (5th Cir. 1981); *Tebbs v. Baker-Whiteley Towing Co.*, 407 F.2d 1055 (4th Cir. 1969); and *River Pars. Co. v. M/V FLAG ADRIENNE*, 2002 WL 1453826 (E.D. La. Jul. 2, 2002). Signet counters that each of these cases "involved an actual or contemplated voyage or movement" rather than an "assist" designed to keep a vessel from moving.

Signet is correct. Three of these cases—*Stevens*, *Tebbs*, and *River Parishes Co.*—involved accidents that happened while a tug was trying to fasten itself to the side of a vessel so that it could embark on a tug or tow of a vessel. *See Stevens*, 649 F.2d at 1109; *Tebbs*, 407 F.2d at 1057; *River Parishes Co.*, 2002 WL 1453826, at *3. And in *Canadian Aviator*, the tow was not attached to the tug, but the tug was guiding it through waters when the tow was grounded. 324 U.S. at 228.

More importantly, each of these cases took place in a context that is dissimilar to the one at issue here: *Stevens* involved a personal injury of a deckhand on a tug, which occurred due to a shifting current and the negligence of tug employees. 649 F.2d at 110. In *River Parishes Co.* the tug grounded itself. 2002 WL 1453826, at *1. In *Tebbs* the tug was attaching to its tow and nudged the tow into another vessel. 407 F.2d at 1057. The tug in *Canadian Aviator* ran its tow aground. 324 U.S. at 217. Each of these cases, then, involves an action by the tug or its crew that resulted in an injury, allision, or grounding. None of these is analogous to what occurred here, where the tugs applied their power to the DPDS1 but could not hold the drillship after the DPDS1's own mooring system failed.

Furthermore, the other cases cited by Paragon to support its position—*In re TT Boat Corp.*, 1999 WL 123810, at *6–7 (E.D. La. Mar. 2, 1999) and *Bisso v. Waterways Transp. Co.*, 235 F.2d at 743—both involved a tug towing a vessel. In *TT Boat Corp*, a tug was towing a manned barge, and the barge allided with an offshore platform. *TT Boat Corp.*, 1999 U.S. Dist. LEXIS 2754, at *6–7. In *Bisso*, a tug was towing a vessel into the entrance of the Southwest Pass of the Mississippi River. 235 F.2d at 743. The tug attempted to swing its tow into the turn, and due to the current the tow continued straight, then moved west, causing the tug and tow to be grounded. *Id.* In both instances, too, a tug was acting in its capacity as mover of other vessels and was in control of the navigation on a journey. These cases are not analogous to the facts here, where there was no journey—just the application of the force of the tugs to prevent the improperly moored DPDS1 from breaking free of the dock.[1]

Additionally, Paragon claims that the district court was inconsistent because, while it did not apply towage law to the August 25, 2017 events, it did apply towage law when it considered the August 28, 2017 incident involving the CONSTELLATION and the UT research pier. But this is not a correct characterization of the district court's opinion. The district court specifically stated that the "law of tug and tow does not govern" the second allision because "Signet did not undertake a tow of the DPDS1" when it agreed to monitor the DPDS1 and then hold it to the shore after it hit the UT research pier. The district court did draw on towage law cases to describe Signet's duties as "neither a bailee nor an insurer of the tow" but held that Signet remained "obligated to provide reasonable care and skill 'as prudent

---

[1] The trial court pointed to the report of Signet's mooring expert, who concluded that given the wind conditions, the two tugboats reduced the tension of the mooring lines by only three percent.

navigators employ for the performance of similar services.'" *King Fisher Marine Serv., Inc. v. The NP Sunbonnet*, 724 F.2d 1181, 1184 (5th. Cir. 1984) (quoting *Stevens*, 285 U.S. at 202)); Even if the employment of this terminology to describe Signet's duties to Paragon were erroneous, it was harmless because it did not meaningfully change the district court's analysis of the responsibilities of Signet and Paragon under maritime negligence law, resulting in the trial court's finding each party 50% responsible for the damage to the UT pier.

Finally, Paragon positions the applicability of towage law as a factor that would diminish its liability meaningfully. That is not the case. As the district court noted, even if towage law applied, Signet would be unable to "complain about a condition of unseaworthiness or other weakness that caused the loss if it knew of the condition and failed to use reasonable care under the circumstances." *King Fisher*, 724 F.2d at 1184. But, as the district court found, Signet had no opportunity to determine whether the DPDS1's mooring system would be adequate to withstand the hurricane—so even a heightened duty for Signet would not result in a finding that Paragon was not negligent.

## III.

Second, Paragon argues that the trial court erred in its holding that Paragon could not rely on a force majeure defense because its "delayed decision and inadequate mooring system represented unreasonably deficient actions by Paragon." Paragon argues that the trial court erred by holding it to a standard of "perfection" rather than reasonability, and by evaluating Paragon's decisions "through some sort of nautical rear view mirror." *United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir. 1956).

The district court correctly articulated and applied the standard for a force majeure defense, which may be invoked by a showing that an "Act of

God," such as a hurricane, occurred and that a shipmaster "took reasonable precautions under the circumstances as known or reasonably to be anticipated." *See In re United States*, 425 F.2d at 995. The district court also correctly noted that "the party asserting the defense bears the burden of proof." *See In re Marine Leasing Servs.*, 471 F.2d 255, 257 (5th Cir. 1973); *see also In re United States*, 425 F.2d at 995 ("The burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense.").

The parties did not dispute that Hurricane Harvey was an Act of God sufficient to activate a force majeure defense. However, with regard to the second factor—reasonable precautions, the trial court cited *Boudoin*, in which our court affirmed a district court's ruling that an appellee was liable for its vessel's breaking free of its moorings and causing damage to a nearby dock during Hurricane Audrey. 281 F.2d at 88. In that case, our court found that, even though Audrey was a hurricane, the appellee failed to meet its burden to show that "the tug master had no reason to anticipate that Audrey would strike with the fury which she had and where the [vessel] was moored" sufficient to excuse his failure to evacuate the vessel. *Id.*

Paragon argues that, while the tug master in *Boudoin* did not attempt to evacuate his vessel, Paragon did try to evacuate the DPDS1 and was foiled in its attempts to do so. However, the district court considered this argument and concluded that "Paragon's delay in deciding to tow the DPDS1 out to sea ultimately caused the drillship to remain at the dock," particularly considering what it knew or should have known about the deficiencies of the mooring system. The district court found the following facts:

1. On August 2, 2017, Aldert Schenkel, Vice President of Engineering, recommended in an email that the DPDS1 should depart 3 days before an approaching storm that had a wind speed of 63 mph or more.

2. On Monday, August 21, Paragon received two weather reports. One, released at 4:00 A.M., reported that the tropical system would reach winds of 65 mph. A report later that morning put Port Aransas in the cone of uncertainty, though it anticipated maximum winds to be at 57 mph. At that time Schenkel (Vice President of Engineering) told Michael Koenig (Marine Operations Manager) that "we don't have to do anything yet" and they had about 24 hours to make a decision.

3. Koenig testified that he thought they should have "immediately" decided to move the vessel, but that he deferred to decisionmakers.

4. A weather report on Monday, August 21, at 4:00 P.M. stated the maximum wind speeds were predicted to be 70 mph.

5. At least one company, Rowan Companies, decided no later than Monday to evacuate and it contacted the Aransas-Corpus Christi Pilots Association to communicate its decision.

6. Paragon was aware that the Genesis Engineering reports estimating the strength of the mooring system were incorrect because it relied on a series of lines that were hypothetical and not actually in place on the vessel.

7. Captain Jay Rivera, of the Aransas-Corpus Christi Pilots Association, testified that a Monday evacuation order would result in a "pretty good chance and a high likelihood" that the DPDS1 would have been towed to sea before the arrival of Hurricane Harvey.

8. The DPDS1 was the only drillship, of five docked along the Texas Gulf Coast, that did not evacuate before Hurricane Harvey.

9. While Charles Yester, Senior Vice President of Operations, took some steps to prepare for an evacuation as early as Monday, he did not file the Deadship Tow Application or communicate with port authorities. Paragon did not issue its official order of evacuation until Wednesday.

Considering these facts, the district court rejected Paragon's argument that the delays on Thursday were unforeseeable, because "prudent shipmasters foresee such situations and factor them into their decision-making timetable." The district court held that a prudent shipmaster would recognize that Navy ships would have priority over commercial ships in an evacuation, and that "[a] prudent shipmaster cannot rely on a plan that assumes a best-case scenario with no sudden changes in circumstances."

As a reviewing court, we have a clear mandate. "Even though we might have weighed the evidence differently had we been sitting as trier of fact, we must accept the district court's findings as long as they are plausible in light of the record viewed in its entirety." *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1247 (5th Cir. 1990). The facts found by the district court are "plausible in light of the record," *see id.*, and in fact reflect in painstaking detail the accounts given in the testimony of Paragon's own officials. The DPDS1 was the only drillship, of five moored there, that did not successfully evacuate from Port Aransas before the storm. This indicates that the trial court did not use "hindsight" but rather applied the judgment that the other drillship owners employed at the time of the storm. The district court's holdings about what a prudent shipmaster would anticipate, and its determination that Paragon did not take "precautions under the circumstances as known or reasonably to be anticipated" are not contrary to law. Paragon has failed to show that it "took reasonable precautions under the circumstances as known or reasonably to be anticipated," *In re United States*, 425 F.2d at 995, and therefore a force majeure defense is not available to Paragon.

IV.

Finally, Paragon contends that the trial court erred in its ruling that the Tariff governed and asks that this court reverse the district court and hold

that the MCA governed Signet's services to Paragon during Hurricane Harvey.

As background on this dispute, in June 2015 Paragon and Signet established the MCA to streamline future vessel-chartering negotiations. Each party was represented by in-house counsel: Jay Oliver, Assistant General Counsel for Paragon, and Scott Reid, General Counsel for Signet. The MCA served as a template for specific projects, allowing quick finalization of details like rates and locations. The MCA includes three documents: the document spelling out the agreement, along with two parts of the Baltic & International Maritime Council SUPPLYTIME 2005 Uniform Charter Party for Offshore Service Vessels ("BIMCO"). Part I of the BIMCO agreement was a form with 35 boxes to be filled in with details regarding each job, which would be completed by business representatives rather than counsel. Part II included contractual provisions tied to each of the boxes in Part I. The main document of the MCA states that the agreement "shall control and govern in all situations in which Owners [(Signet)] charter to Charterers [(Paragon)] a vessel or vessels, and the terms and conditions of this Agreement shall be deemed incorporated by reference." While "activities" and "voyages" are referenced in the MCA, hold-in-place services like those provided by Signet on August 24, 2017 are not.

In August 2016, Signet introduced a Tariff establishing terms and conditions for tug services in its Ingleside division, applicable to customers within the Corpus Christi port area.[2] As is discussed below, Signet billed Paragon according to the Tariff for services it provided earlier that year, in

_____

[2] The district court found that Signet's competitors in Corpus Christi also published tariffs that showed set rates and conditions for services provided within the harbor.

June of 2017, when the DPDS1 had drifted from its moorings and Signet sent tugs to hold it in place.

The parties agree that a maritime contract is reviewed de novo. *See Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984) ("A maritime contract . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous."). Paragon argues that Signet proposed using the Tariff during Hurricane Harvey without an arm's-length negotiation, and that no evidence supports the existence of an oral agreement between Signet and Paragon to apply the Tariff. Paragon argues that the only reference to the Tariff before Hurricane Harvey's landfall came from Signet's General Counsel, Scott Reid, in which he claimed that management agreed to use the Tariff. Even accepting that the Tariff is valid, Paragon contends, the only existing version was the Signet Ingleside Tariff posted on Signet's website and therefore Paragon did not have the ability to review it.

Most problematic, Paragon posits, are the terms in the Tariff that disallow unilateral, unwritten amendments and exclude the kind of services rendered during Hurricane Harvey. In this instance, Signet provided services to a deadship during heightened port conditions—and each circumstance was excluded from the Tariff, according to Section 5, which reads:

> This Tariff does not cover Services to vessels aground or in distress, including assistance to a deadship . . . , or when Services are performed during heightened Coast Guard port conditions.

Further, Paragon points to the contract language of § 21(a) and (b) of the Tariff. Section 21(a) gives Signet the right to "adjust terms or conditions" with "thirty (30) days' advance notice to Owners" and states that these adjustments "shall be in writing." And § 21(b) provides that the "Tariff shall not be amended, modified, or waived unless and until made in writing and signed by each party hereto." Paragon argues that the trial court overlooked the Tariff's prohibition against unilateral waivers under §§ 21(a) and (b).

Paragon contends that the trial court's ruling is contrary to federal maritime and Texas law principles by allowing a unilateral waiver of a provision intended for one party's benefit and, in doing so, rendering a clause of the contract meaningless.

Finally, Paragon argues that the district court's decision undermines the MCA's significance as a blanket contract between the parties to be applicable to multiple transactions. Paragon contends that Signet's refusal to apply the MCA to the new services on the morning of August 24 occurred "at the 11th hour" when there was not "opportunity to discuss or negotiate." Further, Paragon maintains that negotiations between in-house counsels were ongoing, indicating an agreement on material terms. Paragon argues that despite not executing Section I of the MCA, the information was never in dispute between the parties and so it governed services Signet offered during Hurricane Harvey. It asserts that the MCA, established in June 2015, remained in effect and encompassed the services provided during that period. In seeking specific evidence that Signet agreed to provide services under the MCA, Paragon contends, the district court "ignored evidence that the MCA always governs."

In its Order and Opinion, the district court rejected Paragon's argument that the MCA should govern Signet's services during Hurricane Harvey, ruling that the MCA, signed in 2015, provided a "framework" for potential services but lacked specific performance obligations. The district court found that, because the terms of the MCA explicitly did "not obligate" Signet "to charter their vessels to Paragon," or vice versa, it was Paragon's task to prove at trial that Signet agreed the MCA would govern the services provided during Hurricane Harvey.

Based on trial testimony the district court concluded that negotiations between corporate counsels began on Wednesday, August 23, in anticipation

of the tow Signet originally planned to complete before the DPDS1's evacuation was canceled. At that time, e-mails between the two representatives primarily focused on the essential terms within the MCA's Part II, such as insurance and indemnity provisions, emphasizing the uncommon risks posed by Hurricane Harvey. But the Coast Guard's closure of the port on the morning of August 24 and the failure of the DPDS1's evacuation led to a significant change in services: rather than towing it to the sea, the Signet tugs would now be hired to help keep the DPDS1 moored to the dock. At that point, the district court found, "Signet expressly refused" to provide the new services under the MCA. At trial, Barry Snyder—the President and owner of Signet—testified that, in a phone call with Schenkel, he told Schenkel that it would be "very dangerous" to use the MCA for the hold-in-place services. During a deposition, Schenkel testified that he could not remember if he had spoken with Snyder about whether the MCA would govern the hold-in-place services. Accordingly, the district court held that Paragon could not demonstrate that Signet agreed that the MCA would govern Signet's assistance at the dock.

The district court cited other factors for its holding that the MCA did not govern Signet's services during Hurricane Harvey: First, while they discussed and agreed on the MCA terms for the tow-out services, after it became clear that Signet would instead provide hold-in-place services, the parties did not complete the job-specific MCA forms. This signaled an understanding that the MCA did not cover the new services Signet would provide. Second, the district court held that Paragon's focus on MCA's Paragraph 1.3—which stated the MCA "shall control and govern in all situations in which [Signet] charter[ed] to [Paragon] a vessel or vessels"—overlooked the broader context of the MCA, as Part II specified that its application was to "offshore activities" and "voyages." While towing the DPDS1 out to sea would have

fallen under this contract, the district court held, the actual services rendered during Hurricane Harvey did not.

We agree with the district court that the parties' past conduct demonstrates that these services were governed by the Tariff, while MCA discussions arose when considering "offshore activities." For example, Signet billed Paragon according to the Tariff for the services it provided during the water surges in June of 2017, and no party presented evidence that there had been discussion under the MCA. After Hurricane Harvey, Signet tugs held the DPDS1 stationary on the shore of the ship channel, and Signet billed Paragon for Tariff rates, while later talks about a tow to Brownsville for the drillship to be scrapped occurred under the MCA. This consistent pattern illustrated the parties' practical distinction between services governed by the Tariff and "voyages" or "offshore activities" that were conducted under the aegis of the MCA.

The course of dealing is also persuasive evidence that the Tariff did in fact govern Signet's provision of services during Hurricane Harvey. Federal maritime law permits oral agreements to incorporate the terms of a written document, such as the Tariff. *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961). And the course of dealing between Paragon and Signet—in which Signet provided services, Signet invoiced under the Tariff, and Paragon paid without complaint—established a common understanding consistent with industry customs. We agree with the district court that the language of Paragraph 5 of the Tariff explicitly excluding "assistance to a deadship" or services during "heightened Coast Guard port conditions" was for the benefit of Signet and could be waived unilaterally under federal maritime and Texas law. *See Stauffer Chem. Co. v. Brunson*, 380 F.2d 174, 182 (5th Cir. 1967) ("We recognize that alteration, modification or waiver of contract provisions may be implied from the acts and circumstances surrounding the performance of such contract."); *Johnson v. Structured Asset Servs., LLC*, 148

S.W.3d 711, 722 (Tex. App. 2004) ("A party can waive contract provisions that are in the contract for his benefit." (citing *Joiner v. Elrod*, 716 S.W.2d 606, 609 (Tex. App. 1986))).

The trial record supports the district court's conclusion that both parties understood that the Tariff would be the contract under which Signet's provision of services during Hurricane Harvey would be governed, despite contrary language that appeared within the Tariff—and that Paragon was not forced to accept these terms. Similarly, Paragon fails to show that the trial court misapplied contract law in its holding that Signet's waiver of its right to draft separate agreements in scenarios such as risky weather was permissible. Paragraph 5 of the Tariff was designed for Signet's benefit because it allowed flexibility in assigning tug services without individual negotiations and gave Signet the opportunity to provide alternate terms or ask for higher prices in case it provided riskier services. Because Signet expressly agreed to perform services under the Tariff on August 24, Signet waived the restrictions outlined in Paragraph 5 for that instance.

The district court also rejected Paragon's duress and unconscionability defenses, holding that *The Elfrida*, 172 U.S. 186, 192 (1898), does not support Paragon's claim of unconscionable bargains under extreme conditions. The Tariff's consistent terms, accepted by both parties in previous transactions, demonstrate its enforceability. Furthermore, Paragon's argument of immediate danger fails, as it sought Signet's services to support its mooring system, and it was not in a "helpless condition" when it hired Signet. The district court found that Paragon failed to demonstrate that the Tariff is a contract of adhesion because there was no significant one-sidedness or procedural unconscionability—both parties are "sophisticated commercial enterprise[s]" represented by counsel. On August 24, Paragon's counsel, Jay Oliver, sent an email to Scott Reid in response to Reid's own email advising him that the commercial teams had agreed that the hold-in-place would take

place under the Tariff. Oliver's email read "Thanks for the update—much appreciated." The district court concluded that the Tariff continued to govern services through the August 28 incident, with Signet's invoicing Paragon on August 31, 2017, and Paragon's paying without objection.

Upon examination of the law and the record, the trial court did not err in its holding that the Tariff rather than the MCA governed the provision of tugs during Hurricane Harvey. Important facts led the trial court, and lead us, to the conclusion that the parties all agreed that the Tariff governed: First, the uncontroverted testimony of Barry Snyder was that he and Schenkel agreed to the use of the Tariff.[3] Second, Scott Reid's August 24 message clearly stated that "[b]ecause we will not be towing, but instead will be holding the DPDS1 in place, Signet's work will be governed by our Ingleside Tariff." Paragon's General Counsel responded, "Thanks for the update—much appreciated." Third, course of dealing evidence showed that Signet billed Paragon according to the Tariff on multiple occasions for hold-in-place activities and that Paragon had paid these bills without complaint, while discussions about tows out of the harbor involved negotiations under the MCA. Fourth, Signet also billed Paragon under the Tariff on August 31, 2017, for the services it provided during Hurricane Harvey, and Paragon paid without objection.[4]

Taken together, the evidence presented at trial indicates that the Tariff rather than the MCA governed the hold-in-place services that Signet

---

[3] Schenkel testified that he could not remember the conversation.

[4] *See One Beacon Ins. Co.*, 648 F.3d at 266 (ruling against a litigant that "ratified their course of dealing [with the adverse party] by submitting an invoice for the work on the barge without objecting to the terms and conditions").

No. 23-40209

provided when it became clear that its tugs would no longer be towing the DPDS1 to Port Aransas after the failed evacuation.

V.

Having reviewed the facts and record, we find that the district court did not err in applying maritime negligence law, in holding that the force majeure defense was not available to Paragon, or in concluding that the Tariff governed the services that Signet provided during Hurricane Harvey. Therefore, we AFFIRM the rulings of the district court's Opinion and Order.